

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 5, 2023

**BY ECF**

The Honorable Laura Taylor Swain
Chief United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Sharon Charles*, S1 23 Cr. 80 (LTS)

Dear Chief Judge Swain:

      The Government respectfully submits this letter in advance of the sentencing of defendant Sharon Charles.

      As set forth below, the defendant, while employed at the non-profit Justice Innovations, submitted a fraudulent application for COVID-19 benefits, exploiting a global health crisis for her own personal gain. This crime is a serious one, and there is a substantial need for the sentence imposed in this case to send a message of general deterrence. However, as set forth below, there are also meaningful mitigating circumstances present in this case that call for leniency.

      The parties have stipulated to an applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 6 to 12 months' imprisonment. For the reasons explained below, a sentence of two years' probation with the first six months to be served in home detention, would be sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

    A.  **Factual Background**

      On March 29, 2020—in the early days of the COVID-19 pandemic in the United States, as people across the country stopped going to work and retreated into their homes—the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted. The CARES Act authorized the issuance of billions of dollars in forgivable loans to small businesses, so that they could retain and continue to pay their employees and fund certain other business expenses. These loans, issued by the United States Small Business Administration ("SBA") as part of the Economic Injury Disaster ("EIDL") program, were a lifeline for small businesses that otherwise would have been wiped out during the pandemic. Applicants qualified for an EIDL loan only if they had a business that suffered "substantial economic injury" from COVID-19. Applicants could also request an advance of up to $10,000. Individuals submitted EIDL applications electronically through the SBA's

website. Each application contained a certification under penalty of perjury that its contents were true and correct. (PSR[1] ¶¶ 15-19, 60).

Between June 2020 and May 2021, co-defendant Rodney Smith conspired with at least 95 individuals, including Sharon Charles, to submit fraudulent loan applications to the SBA's EIDL program. (PSR ¶ 14.) Each of the 95 applications were submitted from the same IP address, which was assigned to Smith (the "Common IP Address"). (PSR ¶¶ 21, 23.)

On August 4, 2020, Smith submitted Charles' EIDL application from the Common IP Address. In the application, Charles stated that she was the sole owner of a sole proprietorship in her own name. Charles further stated the sole proprietorship was in the "Health Services" business, had five employees, and earned $151,300 in gross revenues in the 12-month period ending on January 31, 2020. These claims were false. Charles did not have a health services business with five employees that earned $151,300 in gross revenue. Indeed, a review of Charles's bank records shows that, during 2019, Charles received much less than $151,300 in deposits into her bank account. Furthermore, a review of Charles's tax filings revealed that, in tax year 2019, Charles reported adjusted gross income of only $94,280, which came primarily from her job at a non-profit. Nevertheless, on August 6, 2020, the SBA approved a $49,000 loan for Charles based on her false application. The next day, Charles received $49,300 into her bank account. (PSR ¶¶ 59-63, 105.)

Charles submitted this fraudulent EIDL application after having previously submitted another EIDL application to the SBA on behalf of her actual consulting business, Sharon Charles-Hewitt Consulting LLC. That application claimed that Charles's business had earned $4,800 and had $2,861 in expenses. Charles eventually cancelled that loan application. (PSR ¶ 63 n.6.) That potentially legitimate application shows that Charles, by the time of her fraudulent EIDL application, understood what information was required to apply for an EIDL loan, and knew how to truthfully report information on the application.

### B. Procedural History and Guidelines Calculation

Charles was charged by complaint with wire fraud and wire fraud conspiracy on November 29, 2022, and was arrested on November 30, 2022, as part of a coordinated takedown involving a total of 19 defendants, including eight of her co-conspirators, charged with similar offenses.

On February 28, 2023, the Government filed Superseding Information S1 23 Cr. 80 (LTS), which charged Charles in one count with the misdemeanor of theft of government funds, in violation of 18 U.S.C. §§ 641 and 2. On March 3, 2023, Charles pled guilty pursuant to a plea agreement dated March 3, 2023 (the "Plea Agreement").

In the Plea Agreement, the parties stipulated to a Guidelines range of 6 to 12 months' imprisonment. The offense level is 10: a base offense level of 6 under U.S.S.G. § 2B1.1(a)(2), with a six-level increase under U.S.S.G. § 2B1.1(b)(1)(D) based on the loss amount of $49,400, and a two-level decrease for acceptance of responsibility. The defendant's criminal history category is I. The Probation Office agrees that this Guidelines calculation is correct, and it

---

[1] PSR refers to the presentence investigation report in this case, which was revised on June 12, 2023. (ECF No. 106.)

recommends a sentence of one year of probation. The defense likewise requests a non-incarceratory sentence.

   C. **Discussion**

      1. **Applicable Law**

The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), and district courts are required to treat them as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After calculating the Guidelines, the Court must consider seven factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

   (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B)   to afford adequate deterrence for criminal conduct;
   (C)   to protect the public from further crimes of the defendant; and
   (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

      2. **A Sentence of Two Years' Probation with Six Months Home Detention Is Appropriate in this Case**

As explained below, despite the seriousness of Charles's offense, the Government believes that in light of unique mitigating factors in this case—namely Charles's difficult childhood, and, despite that, her dedication to her community through non-profit work—a non-incarceratory sentence would be reasonable here. Moreover, unlike nearly all of her co-defendants, Charles was not a government employee when she committed her fraud. Nevertheless, the sentence should still be commensurate with the seriousness of the offense and the need for deterrence, and the Probation Office's recommendation of one year of supervision, with no home detention, is too lenient. Accordingly, the Government requests that a two-year term of probation, with the first six months to be served in home detention, be imposed.

*First*, there is a compelling need for a sentence to convey a message of general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). When the nation was in the throes of the unprecedented COVID-19 crisis, Congress established several programs to help individuals and businesses in dire need.

These programs were meant to ameliorate the effects of a public health disaster that was killing thousands of Americans each day and would eventually kill more than a million Americans. *See Track COVID-19 in the U.S.*, N.Y. Times, https://www.nytimes.com/interactive/2023/us/covid-cases.html (updated July 2, 2023). In particular, with the EIDL program, Congress authorized the SBA to "make low-interest, fixed-rate, long-term . . . loans to overcome the effects of the pandemic by providing borrowers with working capital to meet ordinary and necessary operating expenses." *White Paper: COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape* at 1, SBA-OIG (June 27, 2023), https://www.sba.gov/sites/sbagov/files/2023-06/SBA%20OIG%20Report%2023-09.pdf ("SBA-OIG Report"). Given the exigencies of the pandemic, the COVID-19 benefits programs were inundated with claims and felt urgency to make grants and loans available to people and businesses in need, which put taxpayers further at risk of loss. *Id.* at 3 ("As pandemic assistance programs swelled to more than $1 trillion, the risk to the taxpayer increased because SBA's internal control environment was calibrated to expedite loans and grants.").

Fraudsters exploited the public health disaster and the Government's desire to make money quickly available to those in need. The SBA "disbursed over $200 billion in potentially fraudulent COVID-19 EIDLs, EIDL Targeted Advances, Supplemental Targeted Advances, and PPP loans. This means at least 17 percent of all COVID-19 EIDL and PPP funds were disbursed to potentially fraudulent actors." SBA-OIG Report, Exec. Summary; *see also* Richard Lardner, Jennifer Mcdermott & Aaron Kessler, *The Great Grift: How Billions In COVID-19 Relief Aid Was Stolen Or Wasted*, AP (June 12, 2023), https://apnews.com/article/pandemic-fraud-waste-billions-small-business-labor-fb1d9a9eb24857efbe4611344311ae78 ("An Associated Press analysis found that fraudsters potentially stole more than $280 billion in COVID-19 relief funding; another $123 billion was wasted or misspent."). Given the nature of the fraud, the defendant's crime was hard to detect and prosecute. The public has twice had to bear the burden of Charles's fraud: taxpayers carried the risk when she obtained a taxpayer-backed loan through her lies, and then taxpayers spent money to investigate and prosecute her for those lies.

All told, there is a substantial need for a sentence that will convey a message of general deterrence. *See United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it." (citations omitted)). Fraudulent applications to the EIDL program were unfortunately common. The Court's sentence should show that those who exploit national crises – such as public health emergencies and natural disasters – will face meaningful punishment. Put simply, the sentence imposed by the Court should show that crime does not pay.

*Second*, the sentence imposed should reflect the seriousness of the offense and promote respect for the rule of law. *See* 18 U.S.C. § 3553(a)(1), (2)(A). Charles committed a serious crime. She made brazen false statements to steal $49,400 from a public program that was designed to help small businesses that would otherwise be forced to shutter because of the pandemic. Her fraudulent application was actually her second EIDL application, making her lies in her second application all the more egregious. She also made these false statements while serving as the director of a non-profit, which serves members of her own community accused of crimes. While she was helping others charged with crimes, she herself committed a serious fraud. Such a blatant

disregard for the law, when Charles clearly knew better, counsels in favor of a meaningful sentence.

Although the seriousness of this offense would ordinarily call for a sentence involving a period of incarceration, there are mitigating factors in this specific case that set Charles apart. In light of those factors, the Government agrees that a probationary sentence with a period of home confinement is appropriate for this defendant.

*First*, despite enduring a difficult childhood marred by trauma, Charles became devoted to serving her community and helping others. At a young age, her parents moved to the United States and left her in the care of her grandmother. For approximately three years while Charles lived with her grandmother, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Despite this trauma, Charles persevered. She earned her GED, attended community college, and since 1999, has been working at Justice Innovations, an independent non-profit organization dedicated to justice reform. Charles was motivated to help her community because of the violence she saw in Brooklyn while growing up. While at Justice Innovations, Charles rose to the level of Director of People and Culture, where she, among other duties, developed training and coaching for staff on a variety of topics, including unconscious bias and inclusive leadership. She also oversaw operations for a program which sought to establish community programs to prevent violence in the Bronx and Brooklyn, and she provided guidance on the creation of anti-gun programs. Even though she was demoted following her conviction, she continues to work for Justice Innovations in the role of Senior Advisor of Culture. (PSR ¶¶ 124-49.)

Charles's devotion to the community, even after the embarrassment of a criminal conviction, is commendable and indicates that, despite setbacks, Charles is motivated to continue to serve her community. All of these facts show that the defendant poses a low risk of recidivism, and a lesser sentence is appropriate to reflect the history and characteristics of this defendant. *See* 18 U.S.C. § 3553(a)(1), (2)(C). Sentencing Charles to a period of probation, rather than a term of imprisonment, will allow Charles to continue to help her community and continue her role as the primary caretaker for her husband's son.

*Second*, unlike almost all of the other defendants that were arrested as part of this investigation, Charles was not a government employee. While she served the public in her role at Justice Innovations and while her conduct was serious, she was not in a position of public trust when she committed this crime.

In light of the unique mitigating factors in this case, the Government agrees with the Probation Office and the defense that a sentence without a term of incarceration is appropriate. However, the Government maintains that a six-month period of home detention is warranted given the seriousness of the conduct, the need to promote respect for the law, and the need for general

deterrence. A period of home detention will allow Charles to continue working and earning an income, but will impose a punishment commensurate with her crime.[2]

### D. Conclusion

For the reasons set forth above, a sentence of two years' probation, with the first six months to be served on home detention, would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     /s/
Kedar S. Bhatia
Rebecca T. Dell
Derek Wikstrom
Assistant United States Attorneys
Tel: (212) 637-2465 / 2198 / 1085

Cc: Benjamin Zeman, Esq.

---

[2] Chapter 5 of the Guidelines provides that where the recommended term of imprisonment is in Zone B, as it is here, "the minimum term may be satisfied by . . . a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e)." U.S.S.G. § 5C1.1. Subsection (e) in turn provides as a substitute punishment "[o]ne day of home detention for one day of imprisonment." U.S.S.G. § 5C1.1(e)(3).